## PAULDING *vs.* LEE AND IVEY.

1. *It seems*, that the eighth section of the bankrupt act of August 19, 1841, provides a general limitation which is alike applicable·to suits for the recovery of specific property and choses in action, and is not confined in its operation to suits for the recovery of property in which the defendant sets up an adverse

claim. (*Per* Dargan, C. J., and Chilton, J., the other Judges expressing no opinion.)

2. It is a general rule in equity that relief cannot be granted upon matters which are not alleged in the bill, although they may be proved, and that every material allegation must be put in issue by the pleadings. The decree must be predicated upon *the allegations and the proof*, between which there must be a substantial conformity.

3. Where a bill is filed to enforce an express trust, alleged to have been created by the agreement of the defendant to receive and collect claims, *for the security of a demand due the firm of R., S. & Co.*, proof of an agreement made by the debtor of R., S. & Co. with the defendant, that the latter should receive and collect certain claims, and should pay the proceeds *either to the debtor himself*, *or to three firms of which R., S. & Co. was one*, does not sustain the allegations of the bill.

ERROR to the Chancery Court of Perry.

Tried before the Hon. W. W. Mason.

This was a bill filed by William K. Paulding, and it alleges that he is the owner of a receipt given by the defendant Lee, as an attorney at law, to Ross, Strong & Co., for certain demands due to said firm from Goodwin & Ivey, which receipt had been sold at a bankrupt sale by the assignee as a portion · of the assets of Ross, Strong & Co. It is averred, that in July, 1834, an agreement was entered into between Jno. M. Ross, Silas Ivey and Lee, by which Ross, Strong & Co. were to leave their said demands against Goodwin & Ivey in the hands of Lee, as an attorney at law, for collection, and that Goodwin & Ivey should turn over to Lee notes on solvent persons residing in the neighborhood (their solvency to be judged of by Lee) sufficient in amount to pay off and discharge the demands so left by R., S. & Co. That this agreement was carried out—the notes were left with Lee, who proceeded to collect them, and has derived therefrom money sufficient to pay the demands mentioned in his receipt, but that he has failed to pay it over, or to give any list of the claims so deposited with him, and has fraudulently combined with Ivey, to convert the fund so raised from the collaterals to their own use, withholding from R., S. & Co. all information as to what he has done with the same. That Lee pretends that he has collected nothing from the claims, that they were insolvent; whereas the complainant avers they were good, and that enough of them were collected to pay the demands of R., S. & Co.

That said Lee was guilty of gross negligence and fraud, in failing to commence suit against Goodwin & Ivey, and failed to sue on the same until the spring of 1836. That Ivey had real and personal property sufficient to pay double the amount of said debts, which property Lee aided him in disposing of privately, and in removing to Mississippi portions of the personal property, with a view of defrauding R., S. & Co.

That Goodwin & Ivey pretend to have obtained a discharge under the bankrupt act of 19th August, 1841, but the discharge is fraudulent, by reason of the wilful and fraudulent refusal on the part of Ivey to surrender certain articles of property which are described in the bill. That the receipt of Lee to R., S. & Co., was sold by the assignee in bankruptcy in 1840.

This bill was filed on the 18th February, 1847. Lee and Ivey are both made defendants, and the prayer is for a discovery, and that they may be decreed to pay what has been received or collected from the collaterals, and such other sum or sums as might have been collected but for the fraud and negligence of the defendants; also, that the discharge of Ivey in bankruptcy be set aside and annulled.

Lee and Ivey both answer, and deny that any such agreement as that set up in the bill was ever entered into, or that any notes were ever deposited by Ivey, for the firm of which he was a member, with Lee, for the benefit of Ross, Strong & Co., as charged.

Lee states, in his answer, that he was the attorney at law for Goodwin & Ivey, and had received from them, for collection, certain notes, for which he had given no receipt; that afterwards Ivey procured from him a receipt for said notes, specifying that when collected, the proceeds should be paid to said Goodwin & Ivey, *or* to the payment of certain claims in Lee's hands for collection in favor of Turner & Lewis, Ross, Strong & Co., and Mott & Thompson; that these notes were sued upon in the name of Ross, Strong & Co.; one hundred and seventy-seven $\frac{73}{100}$ dollars only have been collected from them, fifty-five of which he has paid to Messrs. Turner & Lewis, and has their receipt therefor; he denies all combination with Ivey to defraud R., S. & Co., and avers that he

never refused to account or furnish information when called on; he insists that he has been guilty of no negligence or bad faith, but on the contrary, that he has fully discharged his duty as an attorney, both in respect to the notes left with him by Ross, Strong & Co., and those deposited by Ivey & Goodwin as above stated; he claims the benefit of the statute of limitations, and demurs generally to the complainant's bill.

The answer of Ivey substantially corresponds with that of Lee, respecting the notes transferred to the latter by the firm of Goodwin & Ivey; admits that he promised one of the members of the firm of R., S. & Co. to hand over to Lee notes and accounts to a large amount, for the use and benefit of R., S. & Co., Mott & Thompson, Turner & Lewis, and Jack F. Ross, but that Ivey & Goodwin never complied with this promise, and determined to make another arrangement with said effects. Said Ivey insists on the validity of his bankrupt certificate of discharge, and demurs to the bill.

Numerous witnesses were examined, and so much of their testimony as is important to be considered may be thus stated:

Norflett Goodwin, the late partner of Ivey, says, that said late firm was indebted to R., S. & Co. in the sum of about $2000 in 1833–4; that in the spring of 1834, the firm being in failing circumstances, it was agreed between him and Ivey that they should effect a compromise with their creditors, among whom were R., S. & Co.; that Lee was employed to aid them in this matter, and agreed to take their notes and accounts, an inventory of which was made out upon their ledger, amounting to eleven or twelve thousand dollars, many of which were good. He states there was no written agreement in regard to the compromise, and recollects no pledges of Lee, other than as an attorney at law, to collect the claims so placed in his hands so far and as fast as he could, for the benefit of the creditors. "That the understanding between all the parties, viz: Ross, Strong & Co., Jack F. Ross, Turner & Lewis, Mott & Thompson, and John M. Mott, and the firm of Ivey & Goodwin was, that if none of the other creditors of the firm than those named should come into the arrangement, then those already named should derive the whole benefit of it; that Lee, the attorney for the firm, should take the books, papers,

&c., of the concern, do the best he could with them, and get a full release from all the creditors above named in favor of said Ivey & Goodwin;" that before the claims of R., S. & Co. were sent up, the firm of Ivey & Goodwin had employed said Lee as their attorney, and had paid him the sum of $200, but had not delivered over to him their claims. Witness also states, that finding on his return from North Carolina in 1835 that Lee had brought suit against the firm of Ivey & Goodwin in favor of R., S. & Co. and others, he inquired of him how he, being the attorney of Ivey & Goodwin in the matter, could bring suits against them in favor of the creditors of said firms above named, and was informed by Lee that the suit or suits had been brought by Ivey's consent, and that it would be to the advantage of Ivey & Goodwin.

John W. Mott states, that being informed by J. M. Ross at Ivey & Goodwin's store that R., S. & Co. were leaving their claims with Lee for collection, and that Goodwin & Ivey had agreed to deposit claims with Lee to be collected for their benefit, he left his claim with said Lee, taking his receipt, with the understanding that it should be similarly secured; that he has called since on him to learn the condition of the claim, and has uniformly been informed that nothing has been derived from the assets placed in his hands.

John Mc D. Ross deposes, that in July, 1834, he, being a member of the firm of R., S. & Co., placed the demands of said firm against Ivey & Goodwin, amounting to $2000, in the hands of C. W. Lee, for collection, as an attorney at law; that Lee informed him he had received from I. & G. claims on different individuals, sufficient to secure the amount of their indebtedness to R., S. & Co.; that Ivey & Goodwin made an assignment, and applied to their creditors, of whom R., S. & Co. were among the number, and proposed the conditions of the assignment should be acceded to on or before the 28th or 29th July, 1834; that on the 19th of said month, witness proposed to Ivey & Goodwin that he would leave his claims with said Lee, to whom they promised, if the creditors should not perfect the assignment by consenting to it by the 29th July, 1834, they (I. & G.) would place in the hands of said Lee good and solvent notes in said county, and known to said Lee to be good, sufficient to pay the indebtedness of I. &

G. to Ross, Strong & Co.; that he afterwards called upon Lee to pay the amount collected, but was informed by him he had not collected enough to pay the cost.

Thomas Strong says, his understanding was, that all the claims placed by I. & G. in Lee's hands, were for the benefit of R. S. & Co. and Jack F. Ross; that he called on said Lee in the summer of 1838, for settlement, but was answered by him that Ivey & Goodwin had made collections of all the good debts, and he had nothing left for R. S. & Co.; that he frequently wrote him on the subject, but received no answers.

Clinton Ford proves, that he was the book keeper of Jack F. Ross; that in 1833, Goodwin & Ivey were indebted to said Ross in the sum of six thousand dollars, which, so far as the books of said firm disclosed, remains unpaid. He exhibits a letter written by the defendant Lee to J. F. Ross, dated 24th March, 1835, asking for advice, whether he should accept security of I. & G., in discharge of their indebtedness, to the amount of twenty-five hundred dollars, or whether he should refuse this, and contend for the full amount of the claims, the collection of which depended, in his opinion, upon the contingency, as to whether Goodwin did not remove his property from the State; stating also, that he was unable to say what amount would be finally realized upon the notes Goodwin & Ivey had delivered to him; that many of them were valueless.

This witness also exhibits a letter from Ivey to J. F. Ross, dated on the same day, with that from Lee, stating that Goodwin had pocketed the funds which should have gone to the payment of the debts; that Lee was pressing the claims against the firm, in order to subject certain slaves in Goodwin's possession, to their payment; that the proceeds of these, with what he can collect from the notes left with him, will render the creditors of the firm tolerable secure.

The depositions of Ivey and Brown fully sustain the answers; that of Ivey is attacked by several witnesses, who prove his general character, such as to render him unworthy of credit, while on the other hand, a larger number prove him to be a man of good reputation for truth and veracity.

The record contains much proof, showing payments made to Lee on certain notes placed in his hands by Ivey & Good-

win, and some of them sued on in the name of Ross, Strong & Co.

It appears also, that the receipt given by Lee to Ross, Strong & Co., embraced claims amounting to seventeen hundred and sixty-six dollars, and was purchased at the bankrupt sale, by one Livingston, and by him transferred, without recourse, to the complainant, on the 16th May, 1845.

The complainant also read the answer of the defendant Lee, made to a previous bill, in which he admits the receipt of certain claims for the sole benefit of Ross, Strong & Co.; but this is noticed in the present answer, and stated to be a mistake, which subsequent investigation, and a conference with Ivey, to whom a receipt was given for the claims, enables the defendant Lee to set right.

The Chancellor, upon a full hearing on bill, answers, exhibits and proof, dismissed the bill, and his decree is here assigned for error.

GARROTT and SEWALL, for plaintiff in error:

I. Ivey was an incompetent witness for his co-defendant, because,

1. He was a party to the suit, directly interested in the event of it, and at least liable for the cost. Allison v. Allison, 7 Dana, 90; Holman v. Bank of Norfolk, 12 Ala. 370.

2. He is charged in the bill as a *particeps fraudis*, colluding with his co-defendant to complainant's injury, &c. Whipple v. Lansing, 3 John. Ch. 612; Pope v. Andrews, 1 S. & M. Ch. 135; Eckford v. DeKay, 6 Paige, 565; Chambers v. Chalmers, 4 Gill & J. 420; Breedlove v. Stump, 3 Yerger, 257; Ormsby v. Bakewell, 7 Ham. 98.

3. Whether liable or not, he made an active defence, resisting complainant's claim, demurring to bill, examining witnesses and actively mixing in the litigation. And this alone would make him incompetent, even if he had disclaimed. Holman v. Bank of Norfolk, 12 Ala. 370.

II. The bill is not multifarious. It is single as to the subject matter and relief sought, and the defendants are directly connected with the subject matter, the one deriving from the other, and both colluding together in regard to it. Planters' and Merchants' Bank v. Walker, 7 Ala. 926; Watson v. Cox, 1

Ired. Ch. 389; Parish v. Sloan, 3 ib. 607; Vaun v. Harzch, 2 Dev. & Batt. Ch. 31; Wheeler v. Clinton Co. Bank, Harr. Ch. 449. Multifariousness is confined to cases where the case of each defendant is entirely distinct and separate in its subject matter from that of his co-defendants. Kennedy v. Kennedy, 2 Ala. 571; Pleasants v. Glasscock, 1 S. & M. Ch. 17; Wright v. Shelton, ib. 399. The court in this case can go on, and do complete justice between the parties before it, and without injury to the rights of any other persons. There is no proof sustaining the statement in the answer, that other persons have any interest in this controversy. Indeed, such statement is indefinite, and therefore it was not necessary to make them parties. Batre v. Auze, 5 Ala. 173. If Mott & Thompson, and others named in the answer, were proper parties, the failure to make them parties was no ground for dismissing the bill, unless upon being required to amend the complainant refuses to do so. Singleton v. Gayle, 8 Por. 270; Toulmin v. Hamilton, 7 Ala. 362; Hunt v. Wickliffe, 2 Por. 201; Thompson v. Clay, 1 J. J. Marsh. 413; Cooper v. Gunn, 4 B. Mon. 594. They were not proper parties. Dias v. Bonchaud, 10 Paige, 445; 2 Story Eq.

III. Chancery has jurisdiction in this case on the following grounds:

1. It is a trust, which the Court of Chancery will enforce. 2 Story Eq. p. 405, § 1041.

2. For account and discovery. 1 Story Eq. § 458.

3. Agency. Pendleton v. Wamburzie, 4 Cranch, 73; Post v. Kimberly, 9 John. 470–493; Mackenzie v. Johnston, 4 Madd. 374. Nor is it a bar to a bill in equity to enforce a trust, that an action at law for money had and received can be maintained. New York In. Co. v. Ronlet, 24 Wend. 505; 23 Pick. 148, 153.

IV. And the suit was properly brought in the name of the complainants; for a court of equity recognizes an assignment of a chose in action, and will enforce it in favor of the assignee. 2 Story Eq. § 1040, and same p. 392; ib. § 1057, and p. 424, § 1057, a. The complainant was not a volunteer, but a *bona fide* purchaser, for a valuable consideration; not of a mere right to bring a suit, but an actual chose in action, the evidence of which was in the possession of his assignor, and

was delivered to him. See references above. A thing in trust is a matter of alienation. 2 Story Eq. 974, a.

V. The limitation of two years, in the bankrupt act, is no bar to this suit; because,

1. By the terms of the act the limitation extends only to suits, "by or against such assignee, (the assignee in bankruptcy,) or by or against any person claiming an adverse interest, touching the property or rights of property, &c." 5 Stat. at Large, pp. 446–7, § 8. In this case, neither the assignee in bankruptcy, nor any one claiming an adverse interest, is suing. Hence, by the terms of the act, the limitation does not apply. Ex parte Christy, 3 How. 292, 311, 313. And that such is the proper construction is manifest from the tenth section of the act; and the court will not extend the terms of the act by implication or construction.

2. The repeal of the bankrupt act, (3d January, 1843,) was a repeal of this limitation of two years, and left the prescription where it was by the laws of the State. There was no saving in the repealing act of this two years, or of any provision in said act, except so far as to proceedings which were pending in said District Courts. The case then, as to limitation, falls within the rule laid down in Henry and Wife v. Thorpe, 14 Ala. 103; Nichols v. Haskins, 16 Ala. 619; Cox v. Davis, 17 Ala. 714; Piatt v. Vattier, 1 McLean, 146.

VI. The statute of limitations of six years is not a bar to this suit; because,

1. It is not sufficiently pleaded or relied on in the answer. The plea is, that as to the negligence charged, it took place more than six years before suit brought, and he " insists on the benefit thereof." The plea is no defence as to the money collected and withheld, or converted to his own use, which is the *gravamen* of the charge, but only to the negligence in not making the debt out of Ivey, which was but an incident of the abuse of the trust confided to him. Now, the rule is, "that every plea must rest the defence upon a single point creating of itself a bar to the suit." Goodrick v. Pendleton, 3 John. Ch. 384; Allen v. Randolph, 4 ib. 693; Meeker v. Marsh, Saxton, 198; Story Eq. Pl. p. 317, § 661.

2. If the statute applied and was well pleaded, it would not commence running until a demand and refusal. Lever v.

48

Lever, 1 Hill Ch. 62–67; McBroom v. The Governor, 6 Por. 32; Kidd v. King, 5 Ala. 84. Lee denies in his answer that any demand was made on him prior to the first suit; and in his answer to that suit he expressed his willingness to account, or arbitrate the matter. And in case of an agency or trust for the collection of money, the right to sue does not exist, and of course the statute of limitations does not commence running, until the money has been collected by the agent or trustee. Scott v. Osborne, 2 Munf. 413, 420. Lee states in his answer that he collected one claim in 1842, and no where states when he made any other collections. The acknowledgment of the liability in the answers of Lee, defeated the operation of the statute of limitations. 20 John. 576, 586.

3. Because Lee concealed his acts, and failed to give information. This was fraud, and a party cannot avail himself, in bar of claims prosecuted against him, of a lapse of time brought about by his own improper conduct. 2 Story Eq. § 1421, and n. 2, 3; Richardson v. Jones, 3 Gill & J. 153, 188; 1 Story Eq. §§ 207, 210, 219.

4. Because it is a case of direct, express trust, continuing and unexecuted, which is within the exclusive jurisdiction of the Court of Chancery, and such a trust is not within the statute of limitation. 2 Story Eq. §§ 962, 954; Proost v. Gratz, 6 Whea. 481, 487; Cook v. Williams, 1 Green. Ch. 209; Redwood v. Reddick, 4 Munf. 222; Kane v. Bloodgood, 7 John. Ch. 90; McNair v. Ragland, 1 Dev. Ch. 533: 2 Story Eq. §§ 1039, 1040, 1041. At least, until the trustee has openly refused to execute the trust and denied the title of the *cestui que trust*, or practiced a fraud which has been discovered, and then the statute will commence running only from the discovery or knowledge by the *cestui que trust* of such refusal, denial or fraud. Talbot v. Todd, 5 Dana, 190, and cases above cited; and as a bailment, the statute does not apply. Collier v. Poe, 1 Dev. Eq. 55; Story on Bailments, § 2; Pinkerston v. Brewster, 14 Ala. 315. This is not a case of concurrent remedies at law and in equity. There is no remedy at law. A discovery is necessary, also an account; it is a case of fraud, and a case of trust. If Lee has collected more than enough to pay one debt, the surplus belongs to Ivey. A

court of law could not adjudicate the rights of the parties. 2 Story Eq. p. 294, §§ 962, 964. A trust may be created and proved by parol, whether express or resulting, except as to real estate, which is within the statute of frauds. Lord v. Lowry, 1 Bail. Ch. 510; Martin v. Greer, 1 Geo. Dec. 109; 14 Maine, 281; 5 John. Ch. 1. Ivey's discharge as a bankrupt is no bar to the suit against him, for the decree of discharge is void, the court having no jurisdiction.

CLARKE & MOORE, contra:

I. The complainant's bill should have been dismissed:

1. Because it seeks relief as to two separate and distinct matters, against different persons, and prays for two separate and distinct decrees. In such a case, the court, of its own motion, will dismiss the bill. See 1 Story's E. P. § 231, note 1; Greenwood v. Churchhill, 1 Mylne & Keene, 546; 7 E. C. Rep. 163.

2. Because there was a remedy at law, if he had a remedy anywhere.

3. Because the bill shows that complainant has purchased a mere right to bring a suit in equity, for an alleged fraud; which is against public policy, and will not be encouraged by a court of chancery. 2 Story's Equity Jurisprudence, § 1040, G.

4. Because the bill shows, that no suit was instituted on the receipt, until after the lapse of more than two years from the decree in bankruptcy. See Bankrupt Act, § 8, 10; Comyges v. McCord, 11 Ala. Rep. 934; 13 ib. 388; 17 ib. 372; 18 ib. 250.

5. It was the duty of the assignee in bankruptcy to sue upon the receipt. Bankrupt Act, § 10.

II. The answer and evidence show a state of facts, that would prevent the complainant from proceeding without making Mott & Thompson, Turner & Davis, and Jack F. Ross, parties to the bill. The chancellor, in deciding the case, must pass upon the rights of these parties. This he could not do, unless they are properly before the court. Story's E. Jurisprudence, § 1526; Story's E. Pleading, §§ 72–73–74–75–76.

III. The court will not entertain this bill, because of the

staleness of the claim. 2 Story's Eq. Jurisprudence, § 1520, and notes; 9 Peters' 417; 1 Howard, 167–168; ib. 192–3; 3 Brown's Ch. Rep. 640.

IV. The bill charges an express and direct trust. The proof shows that there was no trust. The law never implies a trust, nor will the court presume one. Hill on Trustees, 144, note.

V. If there be a trust in this case, it must have been created by parol declarations; and to create a trust by parol declarations, the words must amount to a clear and explicit trust, and must point out the beneficiaries with certainty. Ib. 59.

VI. A trustee is one to whom the legal title to property is conveyed, for the use and benefit of others. 4 Kent, 305; Hill on Trustees.

VII. The proof shows, that the claims were placed in Lee's hands, as an attorney, and in no other capacity.

VIII. The defendant having denied all the material allegations in the bill, and the complainant having failed to sustain a single allegation, by even one witness, the chancellor was compelled to dismiss the bill; and more especially, when all the material matters in the answer are sustained by two witnesses.

IX. The small discrepancies in the answer of the defendant Lee may be readily accounted for, if we consider the great lapse of time which intervenes between the transaction and the date of the answer; and the further fact, that he kept no books; that many of the claims were small, many insolvent; and that he was attorney for Jack F. Ross, Ross, Strong, & Co., Turner & Lewis and Mott & Thompson, as shown by the proof.

X. The complainant is a mere speculator in bankrupt claims, and is not entitled to the tender consideration of the Court of Chancery, to enforce a pretended claim, which others were too conscientious to prosecute. 2 Story's Eq. Jur. § 440, note 5.

CHILTON, J.—Nearly thirteen years were allowed to pass between the time of giving this receipt by the defendant, Lee, and the period when he was called upon judicially to account

for the claims embraced in it, and the collaterals which, it is alleged, were turned over to him by Ivey & Goodwin, to 'secure their payment. It is, therefore, by no means surprising, that we should find much conflict in the pleadings, as well as the proof, consequent upon the imperfect hold which the memory usually has upon facts which have transpired so many years since. While, however, this consideration should induce the court to place the most charitable construction upon the testimony, attributing any apparent conflict rather to the frailty of the memory, than to any disposition willfully to pervert the truth; nevertheless, the burthen of making full proof, which is devolved upon the complainant, should not be lessened because by his delay he has rendered such proof more difficult to obtain.

The receipt, which is made the foundation of this suit, was sold and transferred, as appears by the written assignment endorsed upon it, by the assignee in bankruptcy, on the 14th May, 1843, and this bill was not filed until the 18th of February, 1847. The first question, therefore, which arises upon the demurrer, is, can this suit be maintained after the lapse of two years from the discharge in bankruptcy? To this I propose first addressing myself.

By the provisions of the bankrupt act of 19th August, 1841, the assignee was vested with all the rights, titles, powers, and authorities, to sell, manage, and dispose of the bankrupt's property and rights of property, as fully, to all intents and purposes, as if the same were vested in, or might have been exercised by the bankrupt, before or at the time of the bankruptcy.

Conceding that the right to dispose of this receipt vested in the assignee, and that the sale not only passed the receipt, but all liability which the maker of it had incurred, either by reason of collateral undertakings to secure the demands mentioned in it, or by negligence or fraud, we think it clear, that he could by his sale transfer no greater interest than could Ross, Strong & Co. before their bankruptcy. He may sell "as fully," says the act, as if the same were vested in, or might be exercised by the bankrupt, but he can do no more. The result is, that upon this hypothesis, he may by his sale transfer an equitable title to the chose in action—a right to

use the name of the assignee to recover in an action at law upon the receipt, for a violation of the contract evidenced by it, indemnifying him against the cost; or, if there be a remedy also in equity, then a right to file a bill, bringing the legal holder of the receipt before the court as a defendant, so as to estop him from afterwards asserting the legal title to the annoyance of the defendant, Lee.

We had occasion recently to consider this question, in the case of Camack v. Bisqua, 18 Ala. Rep. 286, in which we arrived at the conclusion above attained; and a re-examination of that case has failed to satisfy us, that the principle asserted by it is incorrect.

The legal right of action, if any exists, being in the assignee, could he maintain an action, after the expiration of the two years named in the eighth section of the bankrupt act? If he could not, and the legal title be barred, it is very clear that the title to equitable relief, dependent upon it, is also barred. Angel on Lim. 25; Hovenden v. Lord Annesley, 2 Sch. & Lefr. 329; 12 Peters' Rep. 56.

The eighth section of the bankrupt act provides, first, for conferring jurisdiction upon the Circuit Courts of the Union, concurrent with the District Courts in the same district, of all suits, both in law and in equity, which may be brought by the assignee of the bankrupt against any person or persons *claiming an adverse interest*, or by *such* person against such assignee, touching any property or rights of property of said bankrupt, transferrable to, or vested in such assignee; second, a limitation, not for the particular class of suits above mentioned only, but a general limitation, applicable to suits at law or in equity, *in any case*, and in *any court whatsoever*, in which such suits may be brought, either by or against the assignee, or by or against any person claiming an adverse interest, touching the property or rights of property of the bankrupt. This limitation is, two years after the declaration and decree of bankruptcy, or after the cause of suit shall have first accrued. It is quite reasonable to suppose, that Congress designed to provide a short statute of limitation to litigation arising out of the administration of bankrupts' estates. One object was, to speed the settlement of estates, all the proceedings in reference to which, the tenth section declares,

"shall be finally adjusted, settled, and brought to a close, in two years, if practicable." Another was, to make the law a measure of relief for the country in its then embarrassed condition, which relief would hardly have been secured by a release of the unfortunate debtor from his obligations, and at the same time subjecting all those having business connections with him to the most embarrassing litigation, until it should be terminated by the statutes of limitations of the several states.

These statutes are various in the different states; whereas the law, as contemplated by the constitution, was designed to operate uniformly. This uniformity could not result, in the absence of a uniform limitation, as applicable to suits to recover the bankrupt's effects.

Now, unless this limitation is found in the eighth section, above referred to, the act contains none, except as applicable to cases where *an adverse claim* is set up to property or rights of property of the bankrupt. Perhaps it would be difficult to find a substantial reason for prescribing a limitation to suits for the recovery of specific property, which would not equally apply to suits for the recovery of money, or for a breach of duty. Upon the whole, I am of opinion, that the framers of the law very reasonably supposed, that the country might labor under much embarrassment, from the numerous suits and protracted litigation consequent upon the purchase, in many cases at a very trifling cost, of doubtful claims; and it was to meet this, and provide a *general* limitation, as applicable to suits, not only where property was claimed adversely, but in any and every case, and in every court, that this provision was inserted.

This conclusion is not only sustained by reason and a just and proper analysis of the act itself, but by the former decisions of this court.

In Comegys v. McCord, 11 Ala. Rep. 932, which was an action of detinue for a receipt given to the bankrupt for notes, it does not appear what claim the defendant set up to the receipt, or whether it was *adverse* or otherwise. This inquiry was not deemed a matter of importance, and no point was made in the decision respecting it. The court, after referring to the latter part of the eighth section of the bankrupt

law, says: "The limitation is *general*, prohibiting suits by or against the assignee in any court after the lapse of two years," &c.

In Harris, Assignee, v. Collins & Cartright, 13 Ala. Rep. 388, we held the two years limitation. applied to an action of debt, upon a lease reserving rent to the bankrupt. See also Archer v. Duval, 1 Branch's Rep. 219.

I am aware that a different construction has been placed upon this clause by the Supreme Court of Maine, in Carr v. Lord, 29 Maine, (16 Shep.) 21; but I feel satisfied that decision cannot be supported as a "correct exposition of the law upon this subject."

A similar decision has been made in Pennsylvenia, (Union Canal Company v. Woodside, 1 Jones' Rep. 176,) cited in 10 U. S. Dig. p. 62 § 10; but I have been unable to procure the volume containing it.

2. But if the foregoing position be erroneous, it is exceedingly clear this decree must be affirmed upon another ground. In McKinley v. Irvine, 13 Ala. Rep. 693, we said; "The general rule is, that relief cannot be granted upon matters not charged in the bill, although the same may appear in evidence; for the decree must be predicated upon the allegations, as well as upon the proof." And the reason for the rule is, that the defendant is entitled to be informed by the bill what the suggestions and allegations are, against which he is to prepare his defence. Story's Eq. Pl. § 257. The rule requires that every material allegation should be put in issue by the pleadings, so that the parties may be duly apprized of the essential inquiry, and may be enabled to collect testimony in order to meet it. James v. McKernon, 6 John. Rep. 564. See the cases referred to in McKinley v. Irvine, *supra.*

The equity of the bill in the case before us consists, not in the right which the complainant has to proceed against Lee for a breach of his obligation, as contained in the receipt, in failing to collect, or refusing to pay over, moneys upon the demands mentioned in said receipt; for this right could have been adequately asserted in the common law court, and constitutes no ground for a resort to a court of equity. Standifer v. McWhorter, 1 Stew. Rep. 532; Bibb v. McKinley, 9

Por. 636; Herring v. McEldery, 5 Por. 161. Neither does the fact, that the complainant has no right to proceed at law to recover the sums which he insists are due him from the defendant except in the name.of the assignee in bankruptcy, confer jurisdiction upon the equity court. McGehee v. Dougherty, 10 Ala. Rep. 863.

But the true ground, and the only one upon which the bill may be successfully defended, is, that Lee, having received and receipted for the demands of Ross, Strong & Co., agreed with that firm, through one of its members, to receive good notes and accounts on solvent individuals in the neighborhood, of value sufficient, when collected, fully to pay off and discharge said claims of R. S. & Co.; that Ivey, in conformity to said agreement, placed in Lee's hands said notes and accounts, amounting to three thousand dollars, in trust to be collected and appropriated by said Lee to the payment of said claims to R. S. & Co., and that Lee refuses to account for these claims so received in trust. This agreement, creating a direct trust, coupled with the refusal of Lee to execute or carry it out, constitutes the *gravamen* of this bill.

When, however, we come critically to examine the record, it is quite apparent that no such agreement or trust is shown by the proof. The answers of both Lee and Ivey deny it, and there is not a witness who proves it.

John M. Ross, through whom it is alleged the agreement was made, states, that he was informed by Lee that he (Lee) had received claims from Ivey & Goodwin on different persons, sufficient to secure the amount of indebtedness of I. & G. to R. S. & Co.; but the other proof very clearly shows how these claims were deposited with Lee; and this witness states, that I. & G. had made an assignment, and proposed to their creditors to accede to the conditions named in it by the 28th or 29th July, 1834; that on the 19th July, 1834, said witness went to Ivey & Goodwin, and proposed to them, "that he would leave his claims in the hands of Lee, and to whom they, the said I. & G., promised that if, on the termination of the assignment, (that is, the 29th July, 1834,) such assignment should not be perfected, by the creditors of Ivey & Goodwin not agreeing to it, then the said I. & G. agreed to place in the hands of said Lee good and solvent notes, and

accounts due from people in that county, known to said Lee to be good, sufficient to pay the indebtedness of said I. & G. to R. S. & Co." What the conditions of this assignment were, or whether the creditors ever agreed to them, or perfected the assignment, is not shown by this witness. Indeed, he does not state that any claims were ever placed by I. & G. in Lee's hands under this agreement; but merely, that Lee informed him that he had claims which he had received from I. & G., sufficient to secure the amount of I & G.'s indebtedness to R. S. & Co.; but he did not state, nor does it otherwise appear, he had authority thus to appropriate them.

The witness Goodwin, who was examined by the complainant, and who was a member of the firm of I. & G., says, he had ample means of knowing the situation of the firm, having access to all the books and papers of the same; and he testifies that the notes and accounts of said firm were turned over to Lee for the benefit of all the creditors, and that Lee was employed by the firm of I. & G. to obtain them a release from all their liabilities, by procuring the acceptance by the creditors of the compromise, as he calls it; that it was understood and agreed, that if no other creditors of the firm of I. & G. should come into the arrangement, than Ross, Strong & Co., Jack F. Ross, Turner & Lewis, Mott & Thompson, and John M. Mott, then these creditors should derive the whole benefit of the said arrangement. This witness attaches a schedule of the claims, so placed in the hands of Lee, for the benefit of the creditors of the firm, to his deposition. So that, according to the proof made by this witness, the contract under which Lee received the notes was totally different from that set out in the bill.

But it is unnecessary to set out in this opinion the proof made by the several witnesses, as it would render it too prolix. It is sufficient to state, that after a most careful examination of the several depositions taken by complainant, we find no witness who proves the agreement set up in the bill. While on the other hand, as previously observed, the answers positively deny it, and the deposition of Brown, who states he was the clerk of Ivey & Goodwin during the whole time they were engaged in the mercantile business, and had a perfect knowledge of their transactions, goes directly to

sustain the answer of Lee, and to prove that the latter received claims amounting to between four and six hundred dollars from I. & G., and was authorized to pay what he might collect to Turner & Lewis, Mott & Thompson, and Ross, Strong & Co., or to Ivey & Goodwin. Although suits were brought on some of these claims in the names of Ivey & Goodwin, *for the use of Ross, Strong & Co.*, and in some instances the money collected, yet, taken in connection with the proof in the case, this fact fails to sustain the title to relief made by the bill. There were several firms to whom Lee was authorized to pay the money when collected, and it is not remarkable that he should have used the name of one of them, instead of cumbering the action by using the names of all.

The admission contained in the previous answer of Lee, that he held these claims for the sole and exclusive use of Ross, Strong & Co., explained, as we have said in the statement, is not sufficient to warrant the relief prayed. Lee is but the trustee of the fund, and his admissions ought not to defeat the right of the other parties who are the beneficiaries. Besides, if he had made the admission in this suit, and the fact had been positively denied by his co-defendant, as it is, such answer could not be received in evidence against his co-defendant.

But the complainant's own proof satisfies us that Lee was mistaken in his first answer, and this mistake should not in equity be visited with the consequences of an estoppel. Estoppels are not favored in equity, and a court of chancery will never allow an innocent mistake of fact, which does not materially interfere with the rights of the opposing party, so to operate. The previous answer, in view of which this bill may have been filed, could well have been considered with reference to the cost; but it gives no title to relief, under the circumstances of this case.

. In any aspect in which the proof can be viewed, it is very clear, that to afford relief upon it, the complainant would recover upon a state of case different from that he makes by his allegations, or upon an agreement materially variant from that set up by him. We have seen this is not allowable. It follows, therefore, that the Chancellor did not err in refusing the relief prayed.

This view renders it unnecessary, and perhaps improper, that we should decide the other questions raised upon the argument.

The Chief Justice fully concurs with me in both of the foregoing positions; but my other brethren, fully concurring in the last position, prefer to be considered as expressing no opinion as to the construction of the eighth section of the bankrupt act.

Let the decree of the Chancery Court be affirmed.